# DISTRICT COURT OF THE VIRGIN ISLANDS
# DIVISION OF ST. CROIX

| UNITED STATES OF AMERICA | ) |  |
|---|---|---|
|  | ) |  |
| v. | ) | Criminal Action No. 2019-0017 |
|  | ) |  |
| CLINTFORD JOSEPH, Jr., | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

**Attorneys:**
**Melissa P. Ortiz, Esq.,**
St. Croix, U.S.V.I.
*For the United States*

**Michael A. Rogers, Esq.,**
St. Croix, U.S.V.I.
*For Defendant*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Clintford Joseph, Jr.'s ("Defendant") Motion to Suppress ("Motion") (Dkt. No. 18); the Government's Opposition thereto (Dkt. No. 20); and the evidence and arguments presented at the suppression hearing. For the following reasons, the Court will deny Defendant's Motion.

### I. BACKGROUND

On October 1, 2019, the Government filed an Indictment against Defendant charging him with Concealing a Person from Arrest, in violation of 18 U.S.C. § 1071, and Making a False Statement, in violation of 18 U.S.C. § 1001. (Dkt. No. 1).

On October 29, 2019, Defendant filed a Motion seeking to suppress statements made to law enforcement officers. (Dkt. No. 18 at 1). During the subsequent suppression hearing, the Government presented the testimony of two witnesses: Task Force Officer Aldemar Santos ("TFO

Santos") of the Drug Enforcement Administration's ("DEA") High Intensity Drug Trafficking Area Task Force ("HIDTA") and Special Agent Charles Smith ("Agent Smith") of the Federal Bureau of Investigation ("FBI"). The following evidence emerged from the testimony of the two witnesses and Defendant's videotaped interview.[1]

Paul Girard ("Girard"), whom Defendant is charged with concealing, was arrested while serving a separate sentence and ordered detained pending trial. However, Girard was released from federal custody at the conclusion of his sentence instead of being detained, and traveled to St. Croix, U.S. Virgin Islands. Girard was ultimately arrested when law enforcement officers on St. Croix located him in a bedroom in a garage at 84 Clairmont, where he was hiding in the bathroom. When officers arrested Girard, they seized a Digital Video Recorder ("DVR") and five cell phones and left a property receipt at 84 Clairmont providing information regarding the items seized.

At the time of Girard's arrest, Defendant was the caretaker for 84 Clairmont while it underwent hurricane damage repair. Later in the day of Girard's arrest, Defendant noticed that the DVR was missing and reported a burglary at the property. Members of the Virgin Islands Police Department were dispatched to the location to address the issue. This prompted TFO Santos to go to 84 Clairmont to advise Defendant and the officers on the property that when he arrested Girard earlier, he collected the DVR and five cell phones.

When TFO Santos arrived at the property, he showed Defendant a picture of the property receipt on his phone. After hearing from TFO Santos, Defendant was "adamant" that he had not seen anyone at 84 Clairmont. On cross-examination, TFO Santos testified that he did not recall the

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

2

specifics of his entire conversation with Defendant, including whether he explicitly asked Defendant whether he had seen Girard at 84 Clairmont or whether he had called Defendant a "liar." TFO Santos did, however, remember telling Defendant that the DVR was in police custody and asking Defendant whether he was willing to speak to agents about matters "in relation to the DVR" at the HIDTA office the next morning at 9:00 a.m.

At approximately 9:30 a.m. the following morning, Defendant arrived at the HIDTA office at the Almeric L. Christian Federal Building. In accordance with a posted sign, all persons entering the courthouse are subject to a "100% I.D. Check." Per court security protocol, members of the public entering the courthouse must also walk through a metal detector and surrender items such as cell phones and laptop computers. Due to this protocol, Defendant had to leave his cellular device with security.

After going through security, Defendant went downstairs to HIDTA's lobby. TFO Santos greeted Defendant in the lobby, escorted him down a corridor to HIDTA's conference room, and had Defendant sit down at the conference table. The conference room is the largest room in HIDTA—spanning approximately 19 feet by 15 feet. In the conference room, Defendant spoke with Agent Smith and DEA Agent Conwell ("Agent Conwell"). The interview lasted approximately twenty-seven minutes. Both Agent Smith and Agent Conwell were wearing civilian clothing and no guns were visible. Agent Smith sat at the head of the table and Agent Conwell sat opposite from Defendant, between him and the door.

The interview began with Agent Smith introducing himself to Defendant, showing Defendant his badge, and asking Defendant for his identification. Agent Smith then stated, "you came here today," and asked Defendant what was needed. Defendant provided a short summary of his burglary complaint and the events surrounding it, stating that TFO Santos told him that he

3

"needed to" speak with the Agents "in charge" of the investigation the following day. Throughout this summary, Agent Smith asked follow-up questions regarding the house, the house's owner, and Defendant's burglary complaint. Then, Defendant stated that he wanted to get his DVR back and to know what happened.

Agent Smith informed Defendant that law enforcement officials had found a fugitive, Girard, at 84 Clairmont. Agent Smith further informed Defendant that he would not be getting the DVR back because it was evidence in connection with the Girard investigation, but after the investigation concluded the officers would return the DVR to him if they "deem it fit." He asked Defendant questions such as how often he went to 84 Clairmont, and in particular, how often he went to the property's garage. After learning that Defendant went to the premises every day, Agent Conwell asked, "for the past two weeks, as a security officer, you had not seen Girard or anyone else, even after seeing the [security] video?" Agent Smith also expressed that he was confused because, to him, it appeared Girard had been residing at 84 Clairmont for more than a few hours and he found it hard to believe that Defendant failed to witness a "full grown adult" on the premises.

The interview concluded with Agent Smith notifying Defendant that he found it "hard to believe that a grown adult man could be on the property" and Defendant did not notice. Agent Smith testified that he was "confused" by what Defendant was telling him—that parts of his story "didn't make sense, didn't add up." He told Defendant that he was going to be personally involved in determining whether anyone aided and abetted Girard or lied to law enforcement officials and invited Defendant to call him if he thought of any facts that would be helpful in the investigation. Agent Smith told Defendant that he would provide Defendant with his contact information, and Defendant took a piece of paper out of his wallet so that Agent Smith could write his phone number

4

on it. After shaking hands with the Agents, Defendant left the conference room with Agent Conwell so that Agent Conwell could get the license plate number from the car Defendant was driving, which was located in the parking lot. Defendant then left the premises on his own.

## II. APPLICABLE LEGAL PRINCIPLES

The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966) held that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the Government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion).

A suspect is "in custody" when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotations omitted)). To conclude that a person who has not been arrested is in custody, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (quoting *Steigler*, 496 F.2d at 799 (internal quotations omitted)). Additionally, "the relevant environment [must] present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *United States v. Arena*, 629 F. App'x 453, 457 (3d Cir. 2015) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)); *see also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) (noting that the *Miranda* doctrine need only be enforced "in those types of situations in which the concerns

that powered the decisions are implicated" and inquiring whether the stop at issue "exert[ed] upon [the] detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights"). "This determination is objective, based on 'how a reasonable man in the suspect's position would have understood his situation.'" *United States v. May*, 87 F. App'x 223, 227 (3d Cir. 2003) (quoting *Berkemer*, 468 U.S. at 442). Custody determinations for *Miranda* purposes are "made on a case-by-case basis" by considering "the totality of the circumstances." *United States v. Killingsworth*, 118 F. App'x 649, 650 (3d Cir. 2004) (citing *Stansbury v. California*, 511 U.S. 318, 325 (1994)).

The second prong of the *Miranda* analysis requires that the defendant be interrogated by the Government. An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

### III. DISCUSSION

In his Motion to Suppress, Defendant argues that law enforcement officials violated his *Miranda* rights. (Dkt. No. 18 at 1). Defendant contends that because he felt that he was not able to terminate the meeting with law enforcement and that he had to answer the Agents' questions, his freedom was deprived in a "significant way" and he was therefore in custody. *Id*. at 4. Defendant further alleges that he was interrogated because the Agents asked him questions regarding the crimes with which he was eventually charged. *Id*.[2]

---

[2] Defendant also argues that because he was not issued his *Miranda* warnings, any waiver by him was not made knowingly and voluntarily. (Dkt. No. 18 at 5). Although this Court finds that Defendant was not in custody so as to trigger *Miranda*, the Supreme Court in *Beckwith v. United States*, 425 U.S. 341 (1976) found that, in "special circumstances," a confession might be involuntary even if the person giving it is not in custody. *Beckwith*, 425 U.S. at 347-48; *see also*

6

While conceding that Defendant was not informed of his rights pursuant to *Miranda*, 384 U.S. at 499, the Government argues that Defendant was not in custody for *Miranda* purposes. (Dkt. No. 20 at 5). The Government alleges that the "interaction between [Defendant] and the agents clearly demonstrates a non-threatening, non-coercive interplay between the agents and [Defendant] where [Defendant] often volunteered information without questioning." *Id*. The Government also argues that because Defendant was not in custody for *Miranda* purposes, the Court need not determine whether he was interrogated. *Id*. at 7.

The issue here is whether Defendant was subjected to custodial interrogation so as to trigger *Miranda*. The Court finds that Defendant was not in custody, and therefore answers the question in the negative.[3]

To determine whether an individual is in custody for *Miranda* purposes, courts must "ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509 (internal citations and quotation marks omitted) (brackets in original). The Third Circuit has identified several factors that courts should consider in determining whether an individual is "in custody" during questioning for purposes of the *Miranda* totality of the circumstances analysis. These include:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of

---

*United States v. Swint*, 15 F.3d 286, 288-89 (3d Cir. 1994) (treating custody and voluntariness as separate inquiries). However, this is not the type of case contemplated in *Beckwith* because the Agents' behavior did not "'overbear [Defendant's] will to resist and bring about confessions not freely self-determined . . . .'" *Beckwith*, 425 U.S. at 348 (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)).

[3] Because the Government has established by a preponderance of the evidence that the first prong of the *Miranda* inquiry has not been satisfied, the Court need not address the interrogation prong.

voice, the display of weapons, or physical restraint of the suspect's movement; and
(5) whether the suspect voluntarily submitted to questioning.

*Willaman*, 437 F.3d at 359-60. Courts should also consider "the information known by the officer[s] concerning the suspect's culpability," *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (citing *Steigler*, 496 F.2d at 799), as "'[t]he more cause for believing the suspect committed the crime, the greater tendency to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers *Miranda*, and vice versa.'" *Jacobs*, 431 F.3d at 105 (quoting *Steigler*, 496 F.2d at 799). Finally, courts should take into account "whether the officer[s] revealed [their] belief that the suspect was guilty," as this factor may bear upon the custody issue if the officers convey such belief to the suspect "'by word or deed.'" *Jacobs*, 431 F.3d at 105 (quoting *Stansbury*, 511 U.S. at 325). Upon consideration of these factors, the Court concludes that Defendant was not in custody for *Miranda* purposes.

First, neither Agent told Defendant he was under arrest or that he was not free to leave, which weighs against a finding of custody. *United States v. Harder*, 180 F. Supp. 3d 355, 363 (E.D. Pa. 2016) (finding that the defendant was not in custody where "[n]o one told [the d]efendant that he was under arrest or that he was not free to leave."); *see also Reinert v. Larkins*, 379 F.3d 76, 86-7 (3d Cir. 2004) (concluding that the defendant was not in custody even though "he was never told that he was free to leave or free not to answer questions."). Under these circumstances, this factor weighs against a finding that Defendant was in custody.

Second, the fact that the interaction between the Agents and Defendant occurred at the HIDTA office weighs in favor of a finding that Defendant was in custody. Although the door to the conference room was not locked during the interview, the HIDTA office is a secured area—access to which is controlled by the building's security—and the door into HIDTA through the lobby is locked. A secured area within the offices of a law enforcement agency would be a more

8

intimidating location than a non-law enforcement setting. *See United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010) (recognizing that an interrogation at an "FBI office is inherently more intimidating than most locations such as a business office, an automobile, or a public street"—although the totality of the circumstances in *King* did not support a finding of custody). Thus, the second factor weighs in favor of a finding that Defendant was in custody.

Third, the length of the exchange between Defendant and the Agents does not evince custody. The interview lasted approximately twenty-seven minutes. Since "courts have found interrogations lasting anywhere from one and one-half to seven hours to be non-custodial," *Killingsworth*, 118 F. App'x at 651-52 (listing cases), the length of the interview here does not weigh in favor of a finding of custody.

Fourth, the record does not support a finding that the Agents used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraints during their encounter with Defendant. While the Agents were armed, neither of them brandished their weapons or physically or verbally threatened Defendant. The Agents did not yell at Defendant, raise their voices, use physical force against Defendant, or physically or verbally restrain him. *United States v. Savage*, 677 F. Supp. 2d 756, 763 (E.D. Pa. 2009) (finding that the defendant was not in custody where the defendant, among other things, was not verbally or physically restrained by officers and the officers did not raise their voices or display their weapons). Moreover, there is no showing in the record that the Agents' presence effectively transformed the environment into one possessing "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Arena*, 629 F. App'x at 457. To the contrary, based on the Court's review of the videotape of Defendant's interview, the atmosphere was calm and interactive, and Defendant was cooperative. Defendant's level of engagement was such that he sometimes volunteered information, including

that the door to 84 Clairmont's garage was always left unlocked, and the manner in which a friend of his was affiliated with Girard. Thus, this factor weighs against a finding of custody.

The fifth factor asks whether Defendant voluntarily submitted to questioning by the Agents. During both direct and cross-examination, TFO Santos testified that he asked Defendant if he was willing to appear at the HIDTA office the next morning to discuss matters in relation to the DVR.[4] Defendant arrived at the interview on his own; expressed his personal interest in getting the DVR back and finding out what happened; answered the Agents' questions without hesitation; sometimes volunteered information; never indicated that he wanted to leave or terminate the interview; provided Agent Smith with a piece of paper from his wallet so that Agent Smith could write down his contact information on it; shook hands with the Agents at the end of the interview; and left on his own. Additionally, Defendant appeared "calm and cooperative throughout the questioning." *United States v. Vidal*, 85 F. App'x 858, 862 (3d Cir. 2004). These circumstances support a conclusion of voluntariness. Thus, this factor weighs against a finding of custody.

Another factor in determining whether a defendant was in custody for *Miranda* purposes is whether an officer "convey[ed], by word or deed, to the individual being questioned" his or her suspicions about the latter's culpability, and by doing so, "affected how a reasonable person in that

---

[4] At the suppression hearing, Defendant argued that because TFO Santos allegedly appeared unwilling to answer certain questions, his testimony was not credible. However, the Court does not agree with Defendant's contention that TFO Santos' expressed lack of recall constituted an unwillingness to answer questions so as to tarnish the credibility of his testimony. Even if TFO Santos had a heated conversation with Defendant or called him a liar, this would not be dispositive. The issue here is whether Defendant voluntarily appeared and submitted to questioning by other agents the next day. As discussed above, the Court concludes that Defendant's appearance at the HIDTA office and his submission to questioning did not stem from an "order" to do so, but from Defendant's own interest in following up on law enforcement's seizure of the DVR, recovering the DVR, and finding out what had transpired. This conclusion is confirmed by the calm, conversational, and cooperative tone of the relatively brief interaction between Defendant and the Agents.

position would perceive his or her freedom to leave." *Stansbury*, 511 U.S. at 325. However, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue . . . ." *Id*. Although the Agents here expressed their disbelief that Defendant had failed to see a grown man on a property for which he was the caretaker, this factor is not dispositive here especially in view of the calm, interactive, and conversational tone of the interview. The Court finds that a reasonable person subject to similar questioning in a similar environment would not feel that he was not free to leave. *United States v. LeBrun*, 363 F.3d 715, 721 (8th Cir. 2004) ("[T]he coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart.") (citation omitted).

Under the circumstances here, Defendant was not subjected to restraints "to the degree associated with a formal arrest." *Leese*, 176 F.3d at 743. Thus, Defendant was not subjected to custodial interrogation. "[T]he presence of both a custodial setting and official interrogation is required to trigger *Miranda* warnings, therefore, in the absence of one or the other, *Miranda* is not implicated." *Gov't of Virgin Islands v. Christopher*, 990 F. Supp. 391, 393-94 (D.V.I. 1997); *see also Alston v. Redman*, 34 F.3d 1237, 1244 (3d. Cir. 1994) (same). Accordingly, *Miranda* was not triggered and no violation of Defendant's constitutional rights occurred under these circumstances.

## IV. CONCLUSION

For the reasons discussed above, the Court finds that Defendant was not subjected to custodial interrogation. Accordingly, the Court will deny Defendant's Motion to Suppress.

An appropriate Order Accompanies this Memorandum Opinion.


Date: February 28, 2020 _____/s/_____
                                                                                      WILMA A. LEWIS
                                                                                       Chief Judge